UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Coins 'N Things, Inc., | |
| Plaintiff, | |
| v. | Civil Action No.1:18-cv-10257-RWZ |
| United States Postal Service, | |
| Defendant. | |

## REPLY BRIEF OF PLAINTIFF COINS 'N THINGS, INC. TO DEFENDANT UNITED STATES POSTAL SERVICE'S MOTION TO DISMISS

Now comes the Plaintiff, Coins 'N Things, Inc. (hereinafter "Plaintiff" or "CNT") to reply to the Motion to Dismiss submitted by Defendant United State Postal Service (hereinafter "Defendant" or "USPS" or "Postal Service").

## INTRODUCTION

Plaintiff's Complaint in this insurance coverage action sounds in three counts.  Count I is Equitable Estoppel.  Count II is Administrative Appeal.  Count III is Unjust Enrichment.  The Court at its Rule 16 Conference ordered the parties to submit Rule 12 or Rule 56 briefs on Count I only, i.e. equitable estoppel.  The Postal Service, however, has conflated the three distinct counts to move globally for dismissal in contravention of this Court's instructions.  This Reply will focus on equitable estoppel with references to administrative review and unjust enrichment to the extent necessary for context while reserving the right to independently brief counts II and III at a later stage of the proceedings.[1]

---

[1] This brief does not address CNT's affirmative defenses including laches which applies to the extraordinary and inexcusable delays by the Postal Service in finalizing its decision, resulting in prejudice to CNT concerning lost evidence, imperfect memories and unavailable witnesses.  *See United States Postal Serv. v. University Publishing Corp.*, 835 F. Supp. 489 (N.D. Ind. 1993) (laches available against Postal Service).

Plaintiff also put the Court and the Defendant on notice at the Conference that CNT would submit affidavits with its opposition and thereby invoke Rule 56.

## SUMMARY OF ARGUMENT

The Postal Service is not the government.  For purposes of equitable estoppel it is a competitive enterprise.  As with other non-governmental entities, there is no requirement that equitable estoppel against the Postal Service include a showing of affirmative misconduct.  But even under the more stringent standard urged by the Postal Service, affirmative misconduct is amply underscored in the affidavits proffered by CNT.  Plaintiff's affidavits demonstrate that there are triable issues of fact regarding equitable estoppel.  Moreover, discovery is expected to corroborate and expand upon these facts supporting Plaintiff's equitable estoppel theory.  Authorized Postal Service employees solicited CNT's package delivery business, negotiated nominal declared values as an inducement and characterized declared values as an insurance matter only which would not otherwise affect the mailings.  This was a bait and switch scheme by the Postal Service's sales team.

Further, the USPS's meritless contentions will be addressed.

## FACTUAL BACKGROUND

The mailings at issue relate to the period December 1, 2007 to February 28, 2009.  The Postal Service did not issue an official deficiency assessment until November 13, 2013.  CNT appealed administratively.  The appeal was denied on July 27, 2015 and the assessment became final – sort of.  In October 2015, the Postal Service withdrew the assessment after CNT'S initial suit.  Nearly two years later, April 3, 2017, the USPS resurrected its claim against CNT, with an apology for the delay, and requested more documents from CNT, within 60 days, which were not available.  On November 9, 2017, the Postal Service again made its assessment final.  To be fair the 25 months it took for the

Postal Service to finalize the same assessment it made in 2015 included extensions of approximately four months requested by CNT to search, albeit unsuccessfully, for the newly requested records. Complaint ¶¶ 4-6.

Prior to 2008, CNT generated so much business for the USPS that the Postal Service established a satellite office within CNT's secured facility. CNT personnel had daily contact with employees of the USPS. CNT regularly shipped its parcels of precious metals with nominal declared values of either of $100.00 or $1,000.00 notwithstanding that the actual values were typically higher. Employees of the USPS were fully aware of this practice, confirmed and ratified its legitimacy and acquiesced in the longstanding practice of undervaluing the contents. The USPS issued insurance only up to the declared values of the packages. When it deemed it necessary, CNT applied for outside private insurance for packages of substantial value. Service employees at all levels, including regional managers, consistently communicated to CNT that the value required to be declared on packages shipped by Registered Mail was based solely on the level of insurance coverage sought. Complaint ¶¶ 8-12.

Prior to the USPS providing CNT "on-site" service, CNT delivered packages at the Bridgewater Post Office daily. CNT sent over 3,000 packages, declaring nominal values of $100.00 or $1,000.00, no matter their weight, which service employees used to calculate the postage required for each article. CNT listed these values on sheets it was required to complete, which postal workers signed off on each day, clearly showing the nominal values reported and no values indicated for the "insured value" column. CNT generally used private insurance (there were some instances where CNT sought insurance coverage from the USPS and, in those instances, declared the higher actual value of the merchandise shipped) to cover its potential losses on Registered Mail packages where it did not wish to purchase postal insurance. The USPS's employees at the Bridgewater post office, including

Postmaster Heather Spencer, unquestionably knew that all packages being shipped did not contain items valued at either $100.00 or $1,000.00, regardless of weight.  Complaint ¶¶ 13-17.

High level specialists from the USPS engaged CNT in negotiations over a five-month period for on-site acceptance and the use of armed guards given the high values of items that CNT was shipping, specifically discussing the required values that CNT would need to declare to make the arrangement profitable for the USPS.  The Service sent three of its employees at various times to CNT's offices to negotiate a contract including Joanne Smith, Sales Specialist based in Brockton, Massachusetts, Richard Moskal, Operations Integrations Specialist based in Springfield, Massachusetts, and Jane Larson, Manager, Business Development Team, Southeast New England District.  The Service agreed to provide armed police to accompany packages CNT sent out daily, as CNT had disclosed that its packages were worth millions of dollars.  The USPS, wishing to take advantage of this unique business opportunity, indicated through its three negotiators that declared values had to be at least $1,000.00 for the USPS to provide on-site acceptance.  Neither these agents nor any other representative of the USPS prior to May 4, 2009 required CNT to declare the actual value for its packages.  Although the USPS negotiating team attempted to obtain higher nominal values by seeking a declared value of $3,000.00 per package, no suggestion was made to declare actual values which were far greater.  CNT confirmed through several sources at the USPS that no law required postal customers to list the full value of the item being mailed when shipping domestically with Registered Mail.  Complaint ¶¶ 18-24.

In March of 2009 the Postal Inspector issued a *subpoena duces tecum* for CNT'S records related to Registered Mail for the period December 1, 2007 to the then present including but not limited to

"1.  Records of mailings, mailing transaction logs, packing slips, Registered Numbers and Article Numbers.
2.  Customer account records, customer billing records, purchase orders, billing statements, product inventory records that relate to, or are associated with, any and all Registered Mailings made through the U.S. Postal Service."

4

In May 2009 CNT received a letter dated May 4, 2009 from USPS's Southeastern New England's District Manager stating that declarations of full value were required.  CNT complied with the subpoena on July 24, 2009.  In the meantime, CNT sought clarification of the USPS's May 4, 2009 statement regarding the declaration of actual value.  On July 28, 2009 CNT agreed to comply with the USPS's interpretation under protest with a full reservation of its rights.  By letter dated November 13, 2013 from Robert L. Madrid, HQ Revenue & Compliance, a deficiency assessment of $225,826.20 was asserted for the period December 1, 2007 through February 28, 2009.  On January 10, 2014 CNT by letter to Mr. Madrid outlined multiple grounds for appeal and reversal.  The USPS through Charles M. Tricamo, Manager of the Greater Boston District, denied CNT's appeal on July 27, 2015, withdrew the assessment in October 2015, nearly two years later asked for more documents from 2007 to 2009 which were unavailable, and then reinstated the deficiency assessment.  Complaint ¶¶ 25-32.

By Affidavit, CNT's Shipping Manager Al Brown Attests to the following salient facts: The Postal Service employees who dealt with CNT knew CNT was declaring nominal values that did not represent the true value of the precious metals which arrived at the Bridgewater Post Office by a security vehicle.  ¶¶ 6, 7, 9, 10, 13, 14, 15, 16, 17, 19, 20-23.  The USPS never, from December 2008 through February 2009 stated, demanded or asked CNT to declare actual value.  ¶¶ 2, 11, 13, 17, 22, 23.  The USPS actually negotiated a higher nominal value for the packages, thus increasing its fees to justify operating an in-house United States Post Office facility inside CNT's premises.  ¶¶ 13, 17-23. CNT did not complete the column in the Post Office's daily manifest concerning declared value.  ¶¶ 9, 11, 21-22.  The USPS personnel who worked directly with CNT concerning its in-house Post Office and nominally-valued shipments included the Bridgewater postmaster, three sales representatives of the USPS with the apparent authority to effect the opening of a new post office inside CNT's building, a postal inspector, and other USPS employees who were authorized to sign off on daily shipping manifests and process shipments by Registered Mail, and postal police who delivered the packages to

Boston.  ¶¶ 8, 10, 13, 15, 17, 19, 20, 22.  Despite weighing between 4 and 68 pounds, the packages were shipped in flat rate boxes.  ¶¶ 4,6.

Paul Thompson, a Vice President at CNT, who has worked there for over 30 years, attests that the Postal Service was aware of the high value precious metals that CNT ships.  Thompson Aff. ¶6.  CNT through its insurance agent questioned the Postal Service via its customer hotline whether actual declared value was required.  Id. ¶9.  Correspondence from the USPS in CNT's records states that "you are not required by any law to list the full value of the item you are mailing when shipping domestically with registered mail.  However,  if you do list the lower value…[and] the item is lost you will only be reimbursed the amount you declared rather than the item's actual value."  Id.

Mr. Thompson also explains in his affidavit that CNT cannot produce records of the contents and actual value of each package shipped.  Thompson Aff. ¶10.  CNT does not create such records because many customers pre-paid shipping and are storing their goods at CNT.  Many large volume customers are billed one price for goods, shipping and insurance.  Also, CNT used multiple carriers which cannot now be ascertained for specific shipments.  Id. ¶10.

The affidavit of Joseph Balboni who worked in packaging and shipping for CNT corroborates Al Brown's affidavit concerning the fact that no one from the Postal Service ever demanded that CNT post actual values.  Balboni Aff. ¶¶4, 5, 7-9.

CNT founder and President, Mark Oliari, confirms the key points in the foregoing affidavits and unequivocally states that he was unaware that "Registered Mail must be insured by the USPS here and the actual value of the contents of the package must be declared" as asserted by the Postal Service in connection with its 2009 subpoena.  Oliari Aff. ¶¶ 2, 9.  He further remarks that despite his extensive industry knowledge and communications of over 30 years, the concept of declaring full actual value was not known in the precious metals industry.  Id. ¶ 4.  Mr. Oliari asserts that based on the experiences with the Bridgewater USPS of CNT and one of its customers, the Postal Service has

selectively enforced this alleged declared value rule.  *Id.* ¶5.  Mr. Oliari and his team relied on the

Bridgewater Post Office personnel and the USPS representatives to declare nominal values and insure

packages privately.  *Id.*  ¶¶ 8, 10.


## LEGAL BACKGROUND

The United States Postal Service has the power to sue and be sued in its official name.  39

U.S.C. §401(1).  This language constitutes a broad waiver of sovereign immunity.  *Mapoma v. U.S.*

*Postal Service et als,* 1996 U.S. Dist. LEXIS 20254.  "Accordingly, a court must presume the Postal

Service is no less amenable to judicial process, and no les subject to liability for its acts, than any other

business enterprise."  *Id.*  The Postal Service "is not, strictly, the government, but is to be treated as a

private enterprise."  *A.E. Alie & Sons, Inc. v. U.S. Postal Service*, 897 F.2d 591 (1st Cir. 1990) citing

*Azar v. U.S. Postal Service*, 777 F.2d 1265 (7th Cir. 1985).

Equitable estoppel may be available against the government because of the "somewhat unique,

quasi-private status of the Postal Service."  *Portmann v. United States*, 674 F.2d 1155 (7th Cir. 1982).

> "The Service was not performing an inherently sovereign or particularly governmental
> function.  Instead, it was competing directly for plaintiff's business with a number of private
> express mail carriers.  Under these circumstances, we see no reason why the postal service
> should not be held to the same commercial standards in dealing with its customers as would an
> analogous private entity…No threat to the public fisc is involved."
>                                                          *Id.* at 1168-69.

Congress intended the Postal Service to be "a nearly self-sustaining enterprise competitive with

other commercial ventures."  *Gildor v. United States Postal Service*, 491 F. Supp. 2d 305, 309 (N.D.

N.Y. 2007).  Congress in 2006 enacted the Postal Accountability and Enhancement Act to minimize

the differences between the Postal Service and private companies providing similar products and

services.  39 U.S.C. §3600 *et seq*.  It requires the Postal Service to study the ongoing legal differences

between itself and its competitors and ways to eliminate these differences.  *Id.* at §703(a)-(b).  The

effort to reform the Postal Service was governed by five principles:  best practices, transparency,

flexibility, accountability and self-financing.  "None of these principles are advanced by allowing the USPS to evade its promises to customers."  *Gildor*, 491 F. Supp. at 310.  Even its written rate schedules do "not…entitle the USPS to compete by misleading customers about the terms of their services."  *Id*.  "[M]isrepresenting its coverage is in conflict with the federal directives which establish best practices, customer service and accountability as important objectives.  *Id*. at 311.  Postal Service personnel should be properly trained about USPS insurance and the associated rules and regulations to ensure that misrepresentations are not committed.  *Id*.

The Second Circuit has noted that "the claim that the USPS should retain…broad immunity…simply ignores the responsibilities which attend its new autonomy."  *Beneficial Fin. Co. v. New York*, 571 F.2d 125, 128 (2d Cir. 1978).  "USPS's responsibilities have grown as it has gained autonomy, its practical immunity from equitable estoppel is no longer appropriate."  *Gildor*, at 311.

There are four factors of the traditional equitable estoppel test.  The first factor of equitable estoppel requires that the party to be estopped must know the facts.  Second, the party to be estopped must intend that his conduct shall be acted upon or must act so that the party asserting estoppel has a right to believe it is so intended.  Third, the party asserting estoppel must have been ignorant of the facts.  Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.  *Portmann v. United States*, 674 F.2d 1155, 1161 (7th Cir. 1982) citing *TRW, Inc. v. Federal Trade Commission*, 647 F.2d 942 (9th Cir. 1981).

Although the Ninth Circuit in *TRW* noted that the government's action upon which estoppel is to be based must amount to affirmative misconduct, which that court defined as "something more than mere negligence," *TRW*, 647 F.2d at 950-51, it does not require intentional misconduct.  *Azar*, 590 F. Supp. 948, 956 n.2.  Moreover, a fifth requirement to show affirmative misconduct for equitable estoppel against the government acting in its non-sovereign capacity which the Postal Service urges the

court to consider in the current case, does not apply under the well-reasoned Seventh Circuit standard. *Azar* at 954-55.

ARGUMENT

In the present insurance controversy, CNT's affidavits show that its meets the criteria for equitable estoppel.  First, the USPS representatives, the local Postmaster, the Postal Inspector and the employees authorized to accept CNT's daily manifest are deemed to know the facts.  In this case the pertinent facts are the rules governing the Postal Service including the Domestic Mail Manual.  These Postal Service personnel are presumed to have knowledge of their own procedures.  They were also knowledgeable about CNT's shipping operations and its history of not declaring full value.

Second, the Postal Service apparently misrepresented its own Mail Register in its inducements to CNT.  No USPS agent prior to the March 2009 subpoena ever informed CNT that it needed to declare full value.  The opposite is true.  The three USPS representatives who solicited CNT's business by offering to operate a postal satellite within CNT's premises and provide secured transportation of CNT's packages to Boston actually engaged in negotiations about the nominal value.  Clearly, the USPS wanted CNT's shipping traffic, proposed several attractive terms, and expected CNT to act on its conduct and offer, even if the proposal was untrue as to declared value requirements.

Third, CNT was ignorant of the purportedly mandatory nature of the Mail Register, or of any applicable law.  In more than 30 years of business, CNT's President and Vice President were unaware of a requirement to declare actual value.  *See* Oliari and Thompson affidavits.  These executives are knowledgeable about their industry.  Oliari Aff. at ¶ 14.  They conducted research.  Thompson Aff. at ¶9.  The only other incident involving the Postal Service insisting an actual declared values that CNT's people are aware of was the recent experience of one its former customers who tried to ship through the Bridgewater Post Office.  Apparently as a  reaction to this suit the Bridgewater Post Office demanded actual declared values..  Oliari Aff. at ¶ 5.  To their knowledge, this does not happen in

other parts of the country.  *Id*. at ¶ 4.  Further, upon knowledge and belief, only CNT has been targeted. *See Id*. at ¶ 5 (enforcement appears to be selective).

Fourth, CNT reasonably relied on the USPS to its detriment.   Had CNT known that the insurance rates to ship through the Postal Service were tied to the Domestic Mail Manual it would have used a private shipper since it was already insuring privately.  Concealment by the authorized Postal Service agents of a mandatory fee schedule caused CNT to suffer substantial injury.  CNT has expended countless employee hours complying with the subpoena, incurred substantial legal costs and faces a potential assessment of over $225,826.20.  CNT independently asked the USPS if any law required actual value to be listed, and the response from the official helpline was negative.  Moreover, at least six senior USPS officials allowed CNT to use a nominal value.  These were not postal clerks. CNT's reliance was therefore reasonable.

Should the Court determine that affirmative misconduct is a required additional element of estoppel against the USPS, that is also satisfied by these facts.  Lying about a material term to increase sales revenue is misrepresentation.  The Postal Service's conduct toward CNT during the courtship phase was intentionally misleading.

To the extent that the USPS contends that the current record fails to prove nefarious activity by its employees, CNT has proffered sufficient sworn facts to justify discovery under Fed. R. Civ. P. 56(d).  *Kozikowski v. Toll Bros*., 354 F.3d 16 (1st Cir. 2003).  Depositions of Joanne Smith, Richard Moskal, Jane Larsen and Heather Spencer should be revealing and lead to the discovery of admissible evidence.  *See* Brown Aff. at ¶¶ 2, 13; Complaint ¶¶ 17-19.  Those examinations may also lead to further depositions of USPS personnel who worked on a daily basis with CNT, the postal inspector who acquiesced in the nominal values, and the USPS employees who conducted the investigation of CNT and miscalculated the deficiency assessments.

A discussion of summary judgment presupposes that the Court will exercise its discretion to consider CNT's affidavits. *Trans-Spec Truck Serv. v. Caterpiller, Inc.,* 524 F.3d. 315 (1sr Cir. 2008). The Complaint includes a series of attachments which include correspondence between the USPS and CNT. The Amended Answer also references matters outside the pleadings which include the administrative record.

> "Rule 12(b) provides that a court shall convert a motion to dismiss for failure to state a claim into one for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(b). We employ a functional approach to the conversion process…Accordingly, we have not required a district court to give express notice of its intentions to convert if the surrounding circumstances place the parties on notice that the court has the option of treating the motion as a motion for summary judgment and the parties have been given a "reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.""
>
> *C.B. Trucking v. Waste Mgt.*, 137 F.3d 41 (1st Cir. 1998)

Thus, current Rule 12 Motion to Dismiss should be converted to a Rule 56 Motion for Summary Judgment and the Court should either deny the Motion based on CNT's affidavits which provide genuine issues of material fact, or the Court should refrain from ruling until discovery is completed. *Id.* Alternatively, if the Court declines to convert, the Movant still has not met its burden under Rule 12(b) of showing that the Complaint "shows no set of facts which would entitle the Plaintiff to relief." *Collier v. City of Chicopee*, 158 F.3d 601 (1st Cir. 1998).

## DEFENDANT'S CONTANTIONS ARE MISPLACED

Defendant Postal Service relies on several erroneous assumptions or contentions. Its reliance on *A.E. Alie & Sons, Inc. v. United State Postal Service*, 897 F.2d 591 (1st Cir. 1990) as dispositive of the case at bar is simply wrong. The situations are factually distinguishable. The wrong information conveyed by the USPS in *Alie* was by a low-level retail clerk. That misinformation was expressly contradicted by a registered mail receipt furnished to the customer. Reliance by the customer on the oral assurance of coverage was unreasonable. Moreover, the writing precluded parol evidence of that

conversation.  Here, however, six senior USPS officials misrepresented the rules and rates which were not contained in any written instrument supplied to CNT.

The USPS also claims that it is immune from administrative review except for *ultra vires* acts. What could be further beyond the scope of its authority than for the Postal Service agents to engage in a conspiracy of self-serving deception to bait a major customer?  When Congress excepted certain decisions of the Postal Service from the strictures of the Administrative Procedures Act it was not to insulate the USPS from judicial review.  *Reese Bros., Inc. v. United States Postal Service,* 905 F. Supp. 2d 223 (D.C. 2012).  As a general rule, courts are reluctant to find an agency action is unreviewable absent evidence that such was "Congress's intent…the 'crucial inquiry… is whether the Postal Act's statutory scheme and the history of its evolution compel judicial restraint" or allow judicial review of the challenged action."  *Id*.  The Court in *Reese* adverts to a residual or supervisory, non-Administrative Procedures Act judicial review of Postal Service decisions "if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, and has not genuinely engaged in reasoned decision-making."  *Id*. at n. 38. Historically, non-APA review of agency decisions focused on whether the agency's evidentiary fact-findings are supported by substantial evidence, and provide rational support for the agency's inferences of ultimate fact.  The agency must give reasoned consideration to all the material facts and issues.." *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841 (D.C. Cir. 1970).  There is a well-established common law presumption favoring judicial review of final administrative action..  See *Combined Communication Corp. v. United States Postal Service*, 891 F.2d 1221 (6th Cir) citing 28 U.S.C. §1339 and 39 U.S.C. §409(a) (reviewing regulatory action). Jurisdiction in this court is proper.

Here, the USPS's investigation of facts it relied on in reaching its deficiency assessment against CNT was itself deficient.  Key personnel were not adequately interviewed, if at all.  CNT's fact-based

protestations were ignored.  The facts set forth in CNT's four affidavits, which CNT told the USPS investigators, were not considered or properly investigated.  The Postal Service officials either lied, selectively forgot or were conveniently unavailable.  Only discovery will determine the complete story.

The Postal Service's contention that this dispute is merely a collection of money action beyond the reach of equitable estoppel is patently incorrect.  *See* Counterclaim of USPS.  The attempt to recharacterize an improper administrative action as a simple collection case is to whitewash the mistakes that the USPS made in this matter.  The only true aspect of its allegedly simple recovery action is that the Postal Service's conduct was non-sovereign, non-governmental, and not immune to equity.

As to unjust enrichment, which is not properly under consideration here, the USPS wants to be paid nearly a quarter-million dollars for insurance it never provided, risk it never undertook and losses it would not have covered.  If an attorney charged for services not rendered he or she would face disbarment and criminal prosecution.


<u>CONCLUSION</u>

Equitable estoppel exists to promote justice.  It is the perfect antidote to the Postal Service's unconscionable bait and switch scheme.  For the foregoing reasons, the Defendant's Motion to Dismiss should be denied or alternately, it should be converted to a Motion for Summary Judgment and denied, or discovery under Rule 56(d) should be allowed before a ruling is rendered.


Plaintiff Coins 'N Things, Inc.

by its Attorney,


*/s/Harris K. Weiner*

Harris K. Weiner #551981
Salter McGowan Sylvia & Leonard, Inc.
321 South Main Street, Suite 301
Providence, RI 02903
Office: 401-274-0300
Fax: 401-453-0073
hweiner@smsllaw.com

Dated: September 17, 2018

### CERTIFICATE OF SERVICE

I, Harris K. Weiner, hereby certify that on September 17, 2018 the foregoing document, filed through the ECF System will be sent electronically to those indicated as registered participants on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those indicated as non-registered participants.

*/s/ Harris K. Weiner*

Eve A. Piemonte (BBO#628883)
Assistant United States Attorney
United States Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3369
Eve.Piemonte@usdoj.gov